486 P.3d 239
The PEOPLE of the State of Colorado, Petitioner
v.Alma VIDAURI, Respondent
Supreme Court Case No. 19SC933 Supreme Court of Colorado.
April 19, 2021
Rehearing Denied June 1, 2021
Attorneys for Petitioner: Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney General, Denver, Colorado
Attorneys for Respondent: The Noble Law Firm, LLC, Antony Noble, Taylor Ivy, Lakewood, Colorado
En Banc
JUSTICE HOOD delivered the Opinion of the Court.
¶1 In this theft case, we review whether the evidence was sufficient to prove that Alma Vidauri committed a class 4 felony theft. A division of the court of appeals concluded that the evidence was insufficient because the prosecution had not shown the difference in value between the total amount of certain public benefits Vidauri received and the amount for which she might have been eligible had she accurately reported her household income. People v. Vidauri , 2019 COA 140, ¶ 1, ––– P.3d ––––. Therefore, the division reversed the trial court and entered judgment for the lowest level of theft, a class 1 petty offense. Id.
¶2 We reverse the division. The theft statute places no burden on the prosecution to establish that Vidauri would have been ineligible for any of the benefits she received. Eligibility is not entitlement. Because an applicant is not entitled to, and so has no legally cognizable interest in, any benefits until she has submitted accurate information demonstrating as much, we conclude that all the benefits Vidauri received by submitting false information were obtained by deception. Therefore, the original judgment of conviction for a class 4 felony must be reinstated.
I. Facts and Procedural History
¶3 Vidauri was convicted of one count of theft and three counts of forgery in connection with filings she made with the Garfield County Department of Human Services ("Department") between 2009 and 2016 for medical assistance benefits. She submitted, and the Department approved, three applications for Medicaid benefits, one for each of her three children. In the two applications submitted in 2011, she reported that her husband worked for an electrical company and she worked for "Norma," and that their average monthly household income was about $2,600 to $2,900. She later submitted two statements to the Department in 2012 explaining that her husband was no longer employed and that her income was approximately $720 per month. ¶4 Every year thereafter, from 2013 to 2016, the Department sent Vidauri redetermination notices "to see if ... [her] family[ ] [was] still eligible for ... medical benefits." Despite being instructed that she needed to report any changes or missing information, Vidauri never updated her household income even though she reported more than four times that income on her federal income tax returns.
¶5 She also never disclosed to the Department that she and her husband were self-employed, even though she had owned a housecleaning business since 2006 and her husband had owned an electrical business since 2012. The fraud investigator created a spreadsheet of the two businesses’ incomes and expenditures, based on her interviews with Vidauri, records Vidauri provided to her, and Vidauri's tax returns. The spreadsheet, which was admitted into evidence at trial, shows that the housecleaning business generated between $17,000 and $37,000 in profit each year during this time. Although the electrical business lost money in its first year (about $2,000), it generated between $5,600 and $19,600 in profit each year between 2013 and 2015 (there is no data for 2016). The investigator also testified that not all deductions permitted for federal income tax purposes are permitted for benefit eligibility determination purposes.1 Vidauri also failed to disclose that she and her husband owned multiple income-producing properties, several of which they sold between 2011 and 2016.
¶6 Based on Vidauri's incomplete and inaccurate reporting, the Department continued to re-enroll Vidauri's children in Medicaid from 2013 to 2016. It is undisputed that Vidauri and her children received over $20,000 in benefits between 2009 and 2016.
¶7 Vidauri appealed her convictions. As relevant now, Vidauri contended that the evidence was insufficient to support the felony theft conviction because there was evidence that she might have been eligible to at least receive some lesser amount of benefits had she accurately reported her income. Vidauri , ¶ 14. The division agreed. Id. It reversed her felony theft conviction and remanded the case for the trial court to enter a conviction for class 1 petty theft, the lowest level conviction for theft. Id. at ¶ 42.
¶8 We granted the prosecution's petition for certiorari review.2 II. Analysis
¶9 After identifying the standard of review and the statutory elements of theft, we review the different approaches taken by jurisdictions that have considered how to value public benefits obtained by deception. Adopting the total amount approach, we then apply that approach to the facts of this case and conclude that the original judgment of conviction should stand.
A. Standard of Review ¶10 In a criminal case, the prosecution must prove every element of the charged offense beyond a reasonable doubt. People v. Kilgore , 2020 CO 6, ¶ 28, 455 P.3d 746, 751. In reviewing whether the evidence was sufficient to sustain that burden, we consider whether the evidence, "as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." People v. Harrison , 2020 CO 57, ¶ 32, 465 P.3d 16, 23 (quoting People v. Bennett , 183 Colo. 125, 515 P.2d 466, 469 (1973) ). We review the sufficiency of the evidence de novo and "may not serve as a thirteenth juror and consider whether [we] might have reached a different conclusion than the jury." Id. at ¶¶ 31, 33, 465 P.3d at 23. ¶11 Where, as here, the sufficiency of the evidence depends on the interpretation of statutory terms, we also review the court's interpretation of the statute de novo. Id. at ¶ 15, 465 P.3d at 20. In interpreting statutes, our goal is to ascertain and give effect to the legislature's intent. Id. at ¶ 16, 465 P.3d at 20. To do so, "we look first at ‘the plain and ordinary meaning of the statutory language.’ " Nowak v. Suthers , 2014 CO 14, ¶ 20, 320 P.3d 340, 344 (quoting People v. Madden, 111 P.3d 452, 457 (Colo. 2005) ). "A commonly accepted meaning is preferred over a strained or forced interpretation." Id. (quoting People v. Voth, 2013 CO 61, ¶ 21, 312 P.3d 144, 149 ). If the language of the statute is unambiguous, we look no further and apply it as written. Harrison , ¶ 18, 465 P.3d at 20. If, however, the statute is ambiguous or silent on an issue, we may consider other interpretive aids to determine legislative intent. People v. Jones , 2020 CO 45, ¶ 55, 464 P.3d 735, 746.
B. Elements of Theft
¶12 In relevant part, the theft statute states as follows: "A person commits theft when he or she knowingly obtains ... anything of value of another ... by ... deception ... and ... [i]ntends to deprive the other person permanently of the use or benefit of the thing of value." § 18-4-401(1)(a), C.R.S. (2020). Property or a thing of value "is that of ‘another’ if anyone other than the defendant has a possessory or proprietary interest therein." §§ 18-4-101(3), - 401(1.5), C.R.S. (2020). ¶13 To prove the element of deception, the prosecution must prove that the defendant made a misrepresentation, which is "a false representation of a past or present fact," and that "the victim parted with something of value in reliance upon [the defendant's] misrepresentation[ ]." People v. Prendergast , 87 P.3d 175, 185 (Colo. App. 2003) ; see People v. Warner , 801 P.2d 1187, 1189–90 (Colo. 1990) (stating that theft by deception "requires proof that [the defendant's] misrepresentations caused the victim to part with something of value and that the victim relied upon the swindler's misrepresentations" (quoting People v. Terranova, 38 Colo.App. 476, 563 P.2d 363, 368 (1976) )). ¶14 Theft offenses are classified based on the value of the stolen items. § 18-4-401(2). For example, theft is a class 4 felony if the value of the stolen items is between $20,000 and $100,000. § 18-4-401(2)(h). Like the elements above, the prosecution must prove value beyond a reasonable doubt. See Armintrout v. People , 864 P.2d 576, 580 (Colo. 1993) ; see also People v. Tafoya , 2019 CO 13, ¶¶ 27–28, 434 P.3d 1193, 1197.
¶15 Here, the central issue is the value of the benefits Vidauri obtained by deception. Because we have not directly addressed this issue, and the theft statute is arguably silent or ambiguous as to this issue, we join the division in turning to valuation methodologies used by other jurisdictions in this setting. See LaFond v. Sweeney , 2015 CO 3, ¶ 19, 343 P.3d 939, 945 (explaining that where Colorado cases have not previously addressed the issue, "we may look to the decisions of other jurisdictions as persuasive authority").
C. Valuation Methodologies Used by Other Jurisdictions
¶16 The division described two primary valuation approaches—the total amount approach and the overpayment approach—that other jurisdictions have employed to address the same question we answer today. Vidauri , ¶¶ 30–33. As the names suggest, the total amount approach treats the total amount of benefits obtained by deception as the amount stolen, whereas the overpayment approach requires the prosecution to net out the amount for which the defendant would have been eligible.3 ¶17 The total amount approach is found in State v. Edmondson , 92 Ohio St.3d 393, 750 N.E.2d 587, 589 (2001). There, the defendant was convicted of two counts of theft by deception for receiving government benefits based on false information in her application. Id. at 588. The Ohio theft statute is similar to Colorado's, providing that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services ... [b]y deception." Id. at 590 (quoting Ohio Rev. Code Ann. § 2913.02(A)(3) (West 2019)). And, also like the Colorado statute, the Ohio statute categorizes theft into different degrees based on the value of the stolen item(s). Id. at 591 (providing that the relevant amount for the defendant's convictions was at least $5,000). Thus, like Vidauri, the defendant argued that she could not be guilty of stealing the total amount of benefits received because, had she accurately reported her income, she would have been eligible for a lesser amount of benefits, and thus, the total amount was not stolen by deception. Id. at 589.
¶18 The Ohio Supreme Court rejected this argument based on regulatory codes providing that a failure to accurately report necessary information, such as income, on the application would result in a denial of benefits. Id. at 591. The court reasoned that until an applicant is properly deemed eligible to receive benefits, the benefits are government property, not the applicant's. Id.
¶19 The court then summarized the statutory language as requiring proof that "the accused engaged in a deceptive act to deprive the owner of possession of property[;] ... the accused's misrepresentation ... caused the victim to transfer property to the accused[; and] ... the accused wrongfully obtained property ... valued at $5,000." Id. at 592. Under a "straightforward application" of those statutory elements and regulations, the court concluded that because the defendant obtained benefits only after failing to be truthful, and the relevant department had relied on those untruths in approving her for benefits, "[t]he state [did] not have to prove the additional fact ... that the accused obtained benefits for which he or she was not otherwise eligible absent the deception." Id. ("Imposing this additional burden on the state would add an element that does not appear in the theft statute."). Thus, the court held that the correct valuation of the benefits stolen by deception is the total amount received following the deception. Id. ; accord State v. Robins , 34 Conn.App. 694, 643 A.2d 881, 884–85 (1994), aff'd , 233 Conn. 527, 660 A.2d 738 (1995) ; People v. Smith , 84 Mich.App. 376, 269 N.W.2d 469, 470 (1978) ; State v. Farnworth , 199 Wash.App. 185, 398 P.3d 1172, 1185–86 (2017), rev'd on other grounds , 192 Wash.2d 468, 430 P.3d 1127 (2018).
¶20 In the overpayment approach camp is People v. Crow , 6 Cal.4th 952, 26 Cal.Rptr.2d 1, 864 P.2d 80, 82 (1993), in which the defendant was convicted of aiding and abetting another to commit welfare fraud. The relevant criminal statute provided for one additional year in prison if the loss to the victim exceeded $25,000. Id. , 26 Cal.Rptr.2d 1, 864 P.2d at 86. The California Supreme Court concluded that, in determining whether to apply a sentence enhancer, the "agency's ‘loss’ should be calculated by subtracting the amount the government would have paid had no acts of fraud occurred from the amount the government actually paid" because "[a]ny money that the government would have been obligated to pay had the fraud not occurred is not attributable to the fraud, and thus is not a ‘loss’ arising out of the criminal offense." Id. , 26 Cal.Rptr.2d 1, 864 P.2d at 87 ; see also State v. Roberts , 138 Ariz. 230, 673 P.2d 974, 976–77 (Ariz. Ct. App. 1983). The court also noted that adopting a total amount approach would not serve the legislature's intent in enacting the statute to deter large-scale crime. Crow , 26 Cal.Rptr.2d 1, 864 P.2d at 87.
D. Valuation Methodology Chosen by the Division
¶21 Although the division concluded that comparison to these other jurisdictions was "problematic" because those cases either concerned a different type of benefits than those at issue here or the offenses were charged under statutes that aren't comparable to Colorado's statutes, it ultimately adopted the overpayment approach. Vidauri , ¶¶ 29–34. The division concluded that the overpayment approach was appropriate because (1) the Colorado Medical Assistance Act ("CMAA") uses an overpayment approach for disgorging improper benefits through civil actions; (2) the prosecution's "unlimited access to fraud investigators and government employees who make overpayment determinations" makes it reasonable to place the burden of proof for overpayment on the prosecution; and (3) if a defendant obtained all their benefits fraudulently, then both approaches yield the same result. Id. at ¶¶ 35–37. ¶22 We disagree with all three contentions central to the division's rationale. First, the assertion that the CMAA reflects an overpayment approach in civil actions arguably suffers from the faulty premise that we discuss at greater length in the next subsection; namely, that eligibility equates with entitlement (and thus a possessory or proprietary interest in benefits for which the defendant might have been eligible). Moreover, in this criminal case, we must focus on the theft statute. And the CMAA provisions addressing civil liability do not dictate how the theft statute should be construed.
¶23 Second, even if we were at liberty to guess what resources district attorneys might be able to deploy for such a task, we question whether placing the burden on the prosecution of surmising a defendant's eligibility is as reasonable as the division suggests. The fraud investigator in this case, for instance, testified that eligibility determinations are based on numerous factors, many of which frequently change.
¶24 Third, we are also unpersuaded that we should adopt the overpayment approach simply because in some instances the overpayment and total amount approaches would produce the same result. Regardless of the potential overlap, we must be guided by analysis of the plain language of the relevant statutes and regulations.
¶25 Like the Ohio Supreme Court, we conclude that the total amount approach better comports with Colorado law governing entitlement to medical assistance. Unpacking Vidauri's argument to the contrary helps to demonstrate why.
E. Value of Benefits Vidauri Obtained by Deception
¶26 As relevant to the question we agreed to review, Vidauri argues as follows. First, the medical benefits she received are income-based. § 25.5-4-103(13.5), C.R.S. (2020). And federal Medicaid law requires Colorado "to provide medical assistance to certain eligible groups." § 25.5-5-101(1), C.R.S. (2020). If an accurate reporting of her income would have placed her in an eligible group, she would have received some benefits regardless of any deception. So, the government didn't rely on her misrepresentations in providing at least some of the benefits. And second, absent evidence that she would have been ineligible, she cannot be guilty of theft because she did not obtain benefits that didn't belong to her.
¶27 Both arguments fail. The first argument is a non-starter: The record amply demonstrates that Vidauri failed to disclose all her household income, and the government relied on her repeated misrepresentations in providing her with benefits. The second argument is initially more alluring. Vidauri asserts that any benefits for which she would have been eligible were not property "of another" because she alone had a possessory or proprietary interest in those benefits. (Recall that the property would be deemed of "another" if the government retained any interest in it.) But both the division and Vidauri seem to conflate eligibility with entitlement in assessing when one may be said to have acquired a possessory or proprietary interest in public benefits.
¶28 Of course, the words eligible and entitled have different meanings. See Eligible , Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/eligible [https://perma.cc/U9ND-MPLA] (defining "eligible" as "qualified to participate or be chosen"); Entitled , Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/entitled [https://perma.cc/5RHZ-WTRA] (defining "entitled" as "having a right to certain benefits or privileges"); cf . § 17-22.5-403, C.R.S. (2020) (providing the parameters for parole eligibility, which include a discretionary decision regarding whether to grant parole once an inmate becomes presumptively eligible); I.N.S. v. Cardoza-Fonseca , 480 U.S. 421, 443, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("[A]n alien who satisfies the applicable standard under § 208(a) does not have a right to remain in the United States; he or she is simply eligible for asylum, if the Attorney General, in his discretion, chooses to grant it."); Debalco Enters., Inc. v. Indus. Claim Appeals Off. , 32 P.3d 621, 624 (Colo. App. 2001) (discussing the difference between eligibility and entitlement in the unemployment benefits context); In re Marriage of Fernstrum , 820 P.2d 1149, 1151–52 (Colo. App. 1991) (discussing the difference between eligibility and entitlement in the spousal maintenance context). So, as a general proposition, eligibility is not synonymous with entitlement. ¶29 More importantly, nothing specific to the statutory scheme governing medical assistance alters that general, definitional distinction. Vidauri has not shown, nor can we otherwise glean, how she acquired "a possessory or proprietary interest" in these benefits simply based on potential eligibility without proper application.
¶30 On the contrary, Vidauri had to satisfy a variety of Colorado regulatory requirements before acquiring the requisite legal interest in these benefits. The regulations governing medical assistance benefits provide that, "[t]o be eligible to receive Medical Assistance, an eligible person shall ... [m]eet all financial eligibility requirements of the Medical Assistance Program for which application is being made." Dep't of Health Care Pol'y and Fin., 10 Colo. Code Regs. 2505-10:8.100.3.G(1)(d) (2021). Regulations dictate how to determine financial eligibility, including how to calculate and verify income, and how applicants must report and recertify their income. See, e.g. , id. at 8.100.3.K., 8.100.3.P., 8.100.3.Q., 8.100.4.B. Once the Department properly determines that an applicant is eligible to receive benefits, the applicant becomes entitled to receive those benefits as long as she remains eligible. See § 25.5-4-205, C.R.S. (2020).
¶31 The Department relies largely on the applicant's self-reported income to make that financial eligibility determination. 10 Colo. Code Regs. 2505-10:8.100.4.B.(1)(c), (2); see § 25.5-4-301(1)(b), C.R.S. (2020) (requiring recipients of medical assistance benefits to report any increases in income to the Department).
¶32 However, until the Department confirms that an applicant is financially eligible based on truthful information, she is not entitled to—meaning, she has no cognizable property interest in—any benefits. Cf. Weston v. Cassata , 37 P.3d 469, 475–77 (Colo. App. 2001) (holding that federal welfare legislation created a "conditional property right" in certain public benefits that gave rise to procedural due process protection based on recipients’ prior compliance with state statutory and regulatory requirements).
¶33 Here, Vidauri never accurately reported her household income. Thus, the Department could not properly determine Vidauri's financial eligibility; meaning, she was never entitled to, nor had any property interest in, any amount of benefits. Accordingly, all the benefits Vidauri received were obtained by deception.4 ¶34 Because it is undisputed that Vidauri and her children ultimately received over $20,000 in benefits, we conclude that the evidence sufficed to sustain her conviction for class 4 felony theft.
III. Conclusion
¶35 The judgment of the court of appeals is reversed.
JUSTICE BERKENKOTTER dissents, and JUSTICE MÁRQUEZ and JUSTICE HART join in the dissent.
JUSTICE BERKENKOTTER, dissenting. ¶36 The majority concludes that the prosecution does not have to prove that a defendant received public benefits to which she was not entitled to be convicted of theft by deception, a class 4 felony. The majority reasons that so long as the prosecution proves that a defendant misrepresented her income in order to qualify for public benefits, the defendant has no cognizable interest in any benefits, and thus the value of the benefits stolen (which determines the classification of offense charged) is the total amount of benefits received. Maj. op. ¶ 2.
¶37 I respectfully dissent. In my view, the majority's version of the "total amount approach" creates a significant risk that medical assistance recipients will be prosecuted and convicted of felony theft by deception for receiving benefits they are lawfully entitled to receive. In part, this is because the majority's forfeiture-based interpretation of valuation is at odds with how valuation is measured in every other type of theft case in Colorado. This approach is unprecedented in that it can penalize defendants by requiring them to pay more than they stole.
¶38 Moreover, the majority's approach eliminates the prosecution's burden of proof with respect to the value of the public benefits stolen because it assumes that a defendant has no cognizable interest in any benefits if she misrepresented her income in any way. Neither the prosecution nor the majority cite to anything in the theft statute supporting this assertion, which is expressly contradicted by the Colorado Medical Assistance Act ("CMAA"). This approach is also problematic, as illustrated below, because it disregards the presumption of innocence: there is no way to know if a defendant has lied about her income until the trial is over and a verdict is rendered. And, because this approach does not consider the actual impact of the alleged deception on the defendant's eligibility to qualify for benefits, it is likely to cause draconian consequences for individuals charged with public benefit theft under Colorado's general theft statute.
¶39 For these reasons, I would adopt the overpayment approach and conclude that while the prosecution presented evidence of theft by deception, it did not present any evidence of the value of the benefits stolen. I would, accordingly, affirm the judgment of the court of appeals.
I. The Law
¶40 Colorado's general theft statute provides, in relevant part: "A person commits theft when he or she knowingly obtains ... anything of value of another without authorization or by ... deception ... and [i]ntends to deprive the other person permanently of the use or benefit of the thing of value." § 18-4-401(1)(a), C.R.S. (2020). To establish the element of deception, the prosecution must prove that the defendant made a misrepresentation, which is a "false representation of a past or present fact," and "that the victim parted with something of value in reliance [on the defendant's] misrepresentations." People v. Prendergast , 87 P.3d 175, 185 (Colo. App. 2003). The prosecution must prove each of these elements beyond a reasonable doubt. People v. Erickson , 695 P.2d 804, 805 (Colo. App. 1984).
¶41 Theft offenses are classified based on the value of the stolen items. § 18-4-401(2). For example, if the value of the stolen items is between $20,000 and $100,000, the theft is a class 4 felony. § 18-4-401(2)(h). But if the value of the stolen items is between $750 and $2,000, the theft is a class 1 misdemeanor. § 18-4-401(2)(e). Valuation is a sentence enhancer, which the prosecution must also prove beyond a reasonable doubt. See Armintrout v. People , 864 P.2d 576, 580 (Colo. 1993) ("[A] defendant may not be sentenced at the higher felony level unless the factor enhancing the sentence is proved beyond a reasonable doubt."); People v. Simpson , 2012 COA 156, ¶ 14, 292 P.3d 1153, 1155 ("[T]he value of the property taken is a sentence enhancer, not an element of the offense.").
II. Analysis
¶42 I take issue with a number of the majority's conclusions. ¶43 First, the majority concludes that the prosecution bears no burden to prove the sentence enhancer—the value of the stolen benefits—beyond establishing the amount of the total benefits received, reasoning that "[e]ligibility is not entitlement." Maj. op. ¶ 2. But the majority does not and cannot cite to any portion of the CMAA to support its conclusion in this regard. To the extent the majority leans on section 25.5-4-205, C.R.S. (2020), to support its reasoning that eligibility is not entitlement, see maj. op. ¶¶ 30–32, that reliance is entirely misplaced. Section 25.5-4-205 speaks only in terms of an applicant's eligibility—it does not even mention the word "entitlement," let alone draw the critical distinction between those two words on which the majority's entire analysis hinges. Moreover, the majority's conclusion is completely at odds with our longstanding recognition that the value of stolen items is a sentence enhancer that the prosecution must prove beyond a reasonable doubt. Simpson , ¶ 14, 292 P.3d at 1155.
¶44 Second, the rationale underlying the majority's conclusion is misplaced. While the theft statute is silent as to how the prosecution must prove the value of public benefits obtained by deceit, the CMAA speaks specifically to this issue. See People v. Jones , 2020 CO 45, ¶ 59, 464 P.3d 735, 746 ("One of the aids we may employ is to look to other statutes where the legislature has defined the term at issue, particularly when those statutes should be read in pari materia."). Under the CMAA, "[a]ny medical assistance paid to which a recipient was not lawfully entitled shall be recoverable from the recipient," and where such medical assistance has been "obtained fraudulently," interest on that which was fraudulently obtained may be charged. § 25.5-4-301(1)(c), (d), C.R.S. (2020) (emphasis added). That is, if a recipient fraudulently obtains medical assistance benefits to which she is not lawfully entitled, the amount of the overpayment plus interest is the only amount recoverable from the recipient in a civil proceeding brought by the Colorado Department of Health Care Policy and Finance ("the Department").
¶45 These provisions recognize a recipient's entitlement to those public benefits received and create a mechanism for the Department to recover the value of benefits to which the recipient was not eligible to receive due to fraud. In recognizing a recipient's entitlement to benefits she already properly received, the CMAA directly undermines the majority's conclusion that eligibility does not mean entitlement. Maj. op. ¶ 2.
¶46 And, because the CMAA follows an overpayment approach, it does not require a recipient who fraudulently obtained certain benefits to forfeit or disgorge all the benefits she has ever received. Instead, consistent with its purpose, the CMAA requires repayment with interest for those benefits fraudulently obtained.
¶47 The majority's approach, in contrast, has the potential to subject a medical assistance benefits recipient to enhanced sentencing for receiving benefits to which she is expressly entitled under the CMAA. The majority's approach also puts the Department in a tricky spot since it cannot recover benefits to which a recipient is entitled under the CMAA, and yet the Department would presumably be the recipient of any restitution ordered as part of sentencing.
¶48 For instance, because a court must "base its order for restitution upon information presented to [it] by the prosecuting attorney," § 18-1.3-603(2), C.R.S. (2020), if a defendant is convicted of theft of $25,000 in medical assistance benefits under the majority's total amount approach, the court would be required to order $25,000 in restitution payable to the Department, even if the recipient was eligible for some of those benefits. This result would directly conflict with the CMAA.
¶49 Third, there is no precedent in Colorado for valuing theft based on notions of forfeiture. For instance, if an employee fills out time sheets claiming to have worked 2,000 hours in a year and is paid for 2,000 hours, when he or she only worked 1,900 hours, there is no basis to suggest that the employee must forfeit all of his or her wages for that year. That is effectively what the majority is concluding here.
¶50 Fourth, nowhere else in Colorado law does this type of forfeiture-valuation approach determine the class of theft offense with which a defendant can be charged and convicted. The problem with this approach is illustrated by returning to the employment example above. If the employee is paid $10 per hour, the value of the employee's theft by deception is $1,000, a class 1 misdemeanor. Under the majority's forfeiture analysis, the value of the employee's theft by deception would be $20,000, a class 4 felony.
¶51 Fifth, under the majority's total amount approach, the severity of punishment and amount of restitution are driven by a defendant's health circumstances, not the magnitude of his or her deception. That is to say, there is a stark disconnect between the deception alleged and the value of the theft. This means that the majority's approach may result in Colorado's chronically ill and most vulnerable populations being charged with far more serious felonies simply because the cost of their care is greater.
¶52 For instance, under the majority's total amount approach, if medical assistance recipient "A" fails to disclose that she earns $50,000 a year in her 2020 application and then receives $400 in benefits in 2020 before updating and correcting her application, she could be charged with a class 2 misdemeanor. If convicted, she could be sentenced up to six months in jail and ordered to pay $400 in restitution. In contrast, under the majority's approach, if medical assistance recipient "B" fails to disclose a $100 increase per month in her disability benefits in her 2020 application and receives $25,000 in benefits due to her chronic health condition that requires expensive treatment, she could be charged with a class 4 felony. If convicted, she could be sentenced to two to six years in the Department of Corrections, followed by a two-year period of parole, and ordered to pay restitution in the amount of $25,000.
¶53 This is not how the rest of the criminal code operates, which, instead, provides for greater punishment as the severity of the defendant's criminal conduct increases. See, e.g. , § 18-1.3-401, C.R.S. (2020) (providing the presumptive penalties for the different classes of felonies that Colorado law recognizes); §§ 18-3-102 to - 107, C.R.S. (2020) (providing different classes of homicide based primarily on the perpetrator's mens rea).
¶54 Sixth, even if the majority is correct as a matter of law that a defendant who misrepresents facts in an application for benefits is not entitled to any benefits, how does that play out practically at trial? In this post-conviction appeal, we can review the record and determine that there is ample evidence from which a reasonable juror could conclude that Vidauri committed theft by deception of some amount of benefits. But what does the majority's approach mean for the presumption of innocence and the requirement that the prosecution prove each element of the crime charged, and any applicable sentence enhancer, beyond a reasonable doubt in future cases alleging medical assistance benefits theft?
¶55 The answer is that it undermines these fundamental concepts because this approach relieves the prosecution of proving the actual value of the benefits stolen beyond a reasonable doubt by assuming— long before the trial even starts—that the defendant submitted deceptive information. It is worth emphasizing that the majority does not adopt a rule that says if the prosecution proves the defendant misrepresented her eligibility, then the prosecution does not have to prove overpayment because it has shown the defendant has no right to any benefits. Rather, it adopts an approach that is premised on the notion that "if the prosecution proves a defendant misrepresented her income to obtain any benefits, the prosecution does not have to prove the defendant received benefits she should not have."
¶56 There is a reason that the majority does not adopt the if/then approach to this valuation question. It is because, outside of a time-bending Christopher Nolan movie, it is impossible to determine if a defendant misrepresented her eligibility to receive public benefits (thus relieving the prosecution of its burden to prove value beyond proof of the total amount of benefits received) until the jury renders a verdict.
¶57 This case illustrates why the majority's approach is not simply a routine interpretation of a question of law, but rather the adoption of a rule that risks running afoul of many constitutional principles we hold dear.
¶58 Vidauri was charged with having stolen medical assistance benefits between May 11, 2009, and June 30, 2016, in connection with her submission of four separate applications for assistance. Count 1 charged Vidauri with theft of medical assistance benefits, a class 4 felony. She was charged in counts 2 through 5 with forgery in connection with her submission of the four different applications for medical assistance during the seven-year time frame.
¶59 The jury found Vidauri guilty with respect to counts 1, 2, 4, and 5. But with respect to count 3, which charged Vidauri with forgery for allegedly misrepresenting information in her May 2008 application for medical assistance, the jury found Vidauri not guilty.
¶60 At a minimum, this verdict means that Vidauri was entitled to keep all the benefits she and her children received from May 2008 through May 2009. However, because the prosecution only offered evidence of the total benefits Vidauri received each calendar year, there is no way to determine what portion of her total 2009 benefits Vidauri was entitled to keep and what she was not. It is clear, in any event, that in light of the jury's split verdict, Vidauri cannot properly be assumed to have stolen all the benefits she received from February 20, 2008, to December 31, 2009. It is also worth noting that notwithstanding her acquittal as to count 3, Vidauri was ordered to pay back as restitution every dollar she and her children received as benefits between February of 2008 and June 30, 2016, plus interest. So how, then, can the value of Vidauri's theft be accurately calculated without evidence of specific overpayment? The answer is it cannot be. This case illustrates the dangers of the sweeping assumptions built into the majority's iteration of the total amount approach.
¶61 Finally, given the potential consequences of today's decision, I urge the legislature to adopt a statute more tailored to this context; that is, a provision that specifically addresses theft of public benefits and fairly balances the prosecution's burden with the rights of recipients of public assistance. See, e.g. , Ariz. Rev. Stat. Ann. § 46-215(A)(2) (2020) ("A person commits welfare fraud if the person knowingly obtains by means of a false statement or representation, ... [a]ssistance or service greater than that to which the person is entitled.") (emphasis added); Cal. Welf. & Inst. Code § 10980(a) (2020) (making a false statement or representation to obtain aid "knowing he or she is not entitled thereto" or "receiv[ing] a larger amount than that to which he or she is legally entitled" constitutes welfare fraud); Mich. Comp. Laws § 400.60(1)(b) (2020) (an individual commits welfare fraud "by means of willful false statement or representation" if he or she "obtains ... a larger amount of assistance or relief than that to which the person is justly entitled"); Minn. Stat. § 256.98, subdiv. 1(1) (2020) (theft is obtaining benefits "to which the person is not entitled or assistance greater than that to which the person is entitled ") (emphasis added); Va. Code Ann. § 63.2-522 (2020) (a person commits larceny if he obtains benefits "to which he is not entitled" by means of a false representation).
¶62 The Minnesota statute, in particular, clearly articulates that the amount of assistance wrongfully obtained is defined as "the difference between the amount of assistance actually received on the basis of misrepresented or concealed facts and the amount to which the recipient would have been entitled had the specific concealment or misrepresentation not occurred." Minn. Stat. § 256.98, subdiv. 3(1).
¶63 For all these reasons, I believe that, in this specific type of public benefits theft case, the prosecution must meet its burden of proof beyond a reasonable doubt, as it does in every other theft case. That is, it must prove each element of theft by deception beyond a reasonable doubt, and it must prove the value of the thing allegedly stolen beyond a reasonable doubt. Accordingly, I would adopt the overpayment method of calculating the value of allegedly stolen medical assistance benefits and conclude that while the prosecution presented evidence of theft by deception, it did not present any evidence of the value of the benefits stolen. I would, accordingly, affirm the court of appeals.
I am authorized to state that JUSTICE MÁRQUEZ and JUSTICE HART join in this dissent.
1 For example, the actual income from the housecleaning business in 2013 was $221,468. Vidauri claimed $183,663 in business expenses. Thus, the profits for that year were determined to be $37,205 for federal tax purposes. For benefit eligibility purposes, however, because not all of the expenses Vidauri claimed on her taxes would likely be considered, the actual profits used to determine eligibility would likely be higher than $37,205.
2 We granted certiorari to review the following issue:
Whether the court of appeals erred in concluding that to establish the value of theft where a defendant concealed information in order to be deemed eligible for medical assistance benefits, the prosecution must prove how much assistance the defendant would have received if she had been honest.
3 The division categorized these two approaches based on express provisions in the statutes of those jurisdictions. Vidauri , ¶¶ 30, 32. In jurisdictions where the statutes are silent as to valuation, the division categorized the approach taken as a "middle ground" approach. Id. at ¶ 33. For example, in People v. Stumbrice , 194 A.D.2d 931, 599 N.Y.S.2d 325, 327–28 (1993), the statute did not provide a valuation method for theft of public benefits. However, the prosecution provided undisputed evidence of the overpayment amount, and the court adopted an overpayment approach. Id. Because application of the approaches is the same whether the statutes are silent or explicit as to valuation methodology, we do not believe a detailed discussion of this "middle ground" distinction is necessary.
4 The division also supported its conclusion by comparing medical benefits to other public benefits programs in Colorado. Vidauri , ¶ 35 n.2 (citing § 8-74-109(2), C.R.S. (2020) (unemployment insurance); § 26-2-128(1), C.R.S. (2020) (cash assistance); § 26-2-305(1)(a), C.R.S. (2020) (food stamps)). Our decision today does not affect these statutes, given the differences in statutory language. Likewise, this opinion should not be interpreted to prevent Vidauri from raising eligibility for benefits in addressing restitution. See § 18-1.3-602(3)(a), C.R.S. (2020) ("’Restitution’ means any pecuniary loss suffered by a victim ...."). That issue is not before us.